Filed 7/26/22 P. v. Loya CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DANIEL ORIGEL LOYA,<br><br>Defendant and Appellant. | F081538<br><br>(Super. Ct. No. RF008014A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County. Thomas S. Clark, Judge.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Matthew Rodriguez, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kimberly A. Donohue, Catherine Chatman, and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Appellant Daniel Origel Loya was charged with two felonies, rape by force or fear (count 1) and false imprisonment with violence (count 2). (Pen. Code,[1] §§ 261, subd. (a)(2), 236.) The jury convicted Loya on count 1 as charged and of misdemeanor false imprisonment on count 2. The trial court sentenced Loya to the middle term of six years for rape and to a concurrent term of 364 days in jail for false imprisonment. (§§ 261, subd. (a)(2), 237, subd. (a).)

On appeal, Loya claims the trial court erred when it failed to stay his sentence on count 2 under former section 654.[2] Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), he also claims the trial court erred when it imposed a $300 restitution fine (§ 1202.4, subd. (a)), a $300 parole revocation restitution fine, suspended (§ 1202.45, subd. (a)), a $300 sex offender fine with $930 in penalty assessments (§ 290.3, subd. (a)), a total court operations assessment of $80 (§ 1465.8, subd. (a)), and a total court facilities assessment of $60 (Gov. Code, § 70373), without determining his ability to pay. If we find his *Dueñas* claim forfeited for failure to object, he claims he received ineffective assistance of counsel. Finally, Loya was 20 years old when he committed the crimes in this case and, via supplemental briefing filed in accordance with our order, he seeks remand for resentencing in light of Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill No. 567), which amended section 1170, effective January 1, 2022. (Stats. 2021, ch. 731, § 1.3.)

The People dispute any errors occurred and they argue that on this sentencing record, remand is not required under Senate Bill No. 567.

---

[1]     All further references are to the Penal Code unless otherwise specified.

[2]     Section 654 was amended, effective January 1, 2022, by Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill No. 518). (Stats. 2021, ch. 441, § 1.) At the time Loya was sentenced, the trial court was required to sentence Loya under the provision providing for the longest term of imprisonment. (Former § 654, subd. (a).)

We conclude that false imprisonment was the means by which the rape was facilitated in this case and, therefore, the trial court erred when it failed to apply section 654. Further, we conclude that Loya is entitled to remand for resentencing under Senate Bill No. 567. On remand, the trial court shall resentence Loya under section 1170, as amended by Senate Bill No. 567, and shall stay the sentence on one of the two counts under section 654, as amended by Assembly Bill No. 518. Remand of this matter for resentencing renders Loya's *Dueñas* claim moot, and we need not consider it. The judgment is otherwise affirmed.

## FACTUAL SUMMARY

### I.  Prosecution Case

Loya and H.G. were high school friends. They went their separate ways after graduating in 2016, but resumed their friendship in the summer of 2018 after Loya saw H.G. at her place of employment. They began texting regularly and met up approximately four times in the two-week period before the crime, either at the park or the community college in town.

The first time they met up, they sat in Loya's car and talked. Loya asked H.G. for a kiss and then leaned over to kiss her, which she allowed. He then pulled her over so that she was on top of him in the driver's seat of the car and they kissed but nothing further happened.

They met a second time at the college and again kissed with H.G. positioned on top of Loya in the driver's seat. On that occasion, she allowed him to touch her underneath her clothing and penetrate her vagina with his fingers.

They met two more times at the park. Throughout this period of time, they communicated frequently and Loya asked H.G. numerous times if she would have sex with him. She always told him no and he knew she was a virgin.

On the fourth occasion, Loya's daughter, who was old enough to walk but not yet talk, was in the backseat. They sat in Loya's car for 20 or 30 minutes, and Loya asked

3.

H.G. if she was serious about him. She told him she was unsure because he had a child and was on-and-off with his girlfriend. Loya again asked H.G. if she would have sex with him and she said she was not ready. Loya's daughter was crying in the backseat, and he said he needed to go home to change her diaper and get her some milk.

H.G. went with Loya to his house and he changed his daughter, gave her milk, and turned the television on for her. Loya then picked up H.G., put her on the bed that was in the living room, and began kissing her. When his daughter walked into the living room, H.G. pulled away and told Loya to stop. Loya then took H.G.'s hand, led her to a bedroom, shut the door, and told her to sit down. Loya's daughter was on the other side of the door crying, so H.G. told him to let her come in. Loya instead leaned over her and kissed her. He kept telling her to lie down and she kept asking him why.

After they laid down, Loya grabbed H.G.'s neck with his hand. His daughter was still crying and H.G. asked him to let her in. He responded it was okay, and H.G. told him if he was planning to have sex, she was not ready. He again told her it was okay and he would be gentle with her. She restated she was not ready. As they kissed, Loya grabbed one of H.G.'s hands and rolled on top of her. She told him to get off and he said, " 'Just trust me.' " She said, " 'I'm not ready. Please.' " He responded, " 'I promise it's going to be really easy. I'll go gentle. It's not going to hurt.' " She again said, " 'I'm not ready. Please.' "

As Loya maneuvered his legs in between hers, H.G. managed to scoot up the bed away from him. He grabbed her and pulled her back down toward him, and then grabbed her other hand, pinning her arms above her head with one hand. He used his free hand to pull down her leggings. H.G. saw Loya's penis at this point and panicked because she knew what he was going to do. She told him she was not ready. He laughed when he looked at her eyes tearing up and told her not to be scared. She tried to get away, but he was larger and heavier than she was. She told him, "Please don't," and that she was scared but he just said it was going to be okay.

Loya told H.G. to relax and let go. Using his body weight, he forced her legs apart. As he tried to penetrate her vagina with his penis, H.G. told him multiple times to stop and that he was hurting her. Loya penetrated H.G.'s vagina with his penis and had intercourse with her for two or three minutes before withdrawing because she was crying. She thought it was over and started to get up, but Loya pulled her around and positioned her facedown on the bed. She was crying and told him, "Please. Not like this, not like this." Loya had one hand on the back of H.G.'s head and her voice was muffled by the bedding, but she told him to stop as loudly as she could and said, "Stop. Please, Danny, stop."

H.G. testified that she felt he was "trophying" her, making comments like, "Oh, damn, H[.]," and "Oh, my God. This is going to be easy." She struggled and told him multiple times to stop, that he was hurting her. Loya penetrated her vagina again with his penis. H.G. felt him thrusting and after his body shook, he withdrew his penis and moved off of H.G. She told him he hurt her "really, really bad," and he said she was lying because he went easy on her. Loya then drove H.G. back to her car at her request.

Two days later, H.G. went to the hospital and then to the police station, where she gave a recorded interview, during which a SART representative and her father were also present. H.G. told Officer Beard she did not report the crime sooner because she was worried about what would happen to Loya's daughter.

During the interview, H.G. stated that Loya had sex with her two days earlier. She became scared when Loya locked the door, and he pinned her arms above her head, removed her pants, and penetrated her vagina with his penis approximately six times. She repeatedly told him no, stop, and that she was not ready. When he moved off of her, she thought she could get away and tried to pull up her leggings, but he thrust her down on the bed facedown and again penetrated her vagina with his penis. H.G. also told Loya to stop while she was facedown on the bed. H.G. stated that Loya forced her to have sex,

5.

and based on H.G.'s description, Officer Beard characterized Loya's behavior at trial as "very sexually aggressive."

H.G. was distraught and crying during her police interview. She did not tell Officer Beard that Loya laughed at her; that she previously met up with Loya, made out with him, and allowed him to penetrate her vagina with his fingers; or that she apologized to him for teasing him.

Approximately two weeks after the crime, H.G. placed a pretextual phone call to Loya, which was monitored and recorded by Officer Clinton. A recording of their conversation was played for the jury. H.G. was crying throughout the call. Loya apologized, and he said what he did was not okay, he did not mean to, he should not have done it, he regretted everything, and he acknowledged knowing that she was upset.

In addition, numerous text messages between H.G. and Loya were admitted. They discussed entering into a relationship and on the day of the rape, hours before, H.G. texted, "Well ima be clear with one thing okay, I'm not going to sleep with you any time soon. I don't want to bring this up but I need you to understand… the dude I have a history with… over 3yrs I talked to him. So you can imagine I did fall in love with him. But not once did I ever let myself sleep with him. Bcz I wanted to be sure it'll only be given to the person Ima spend the rest of my life with. I truly believe that. Like I'm general. He was the first to touch me and now your the second. He never asked me for anything more. So I'm asking from you… it'll work out with us as long as we respect one another."

Loya replied, "And i completely respect that you want to take time i don't need to have sex to be happy honestly love from the heart commitment and conpasion will make me happy. When i ask you for sex its cause im in the mpment and you just know how to turn me on haha thats why but i dont need it nor will i ever pressure you into it. I want to love you and grow eith you…."

There were references in the texts about H.G. teasing Loya in his car and apologizing for "teasing [him] too hard" He responded, "[Y]ou never tease me to hard haha as long as you are comfortable doing it too tho you are right I don't wanna force you con nada." H.G. told him he did not force her and he "just get[s] into the mpment."

After the rape, Loya texted H.G., and asked if she was home and how she was feeling. She responded, "Not okay fuu." He asked why and she said, "Bcz you knew I didn't want to…." He responded, "I thought you were telling me no but deep down you wanted to im sorry i fucked up i shouldnt have pressured you." H.G. said, "I don't want to do it again. Sorry I lead you on. Especially for that. I thought you knew…." Loya responded, "I should have stopped im sorry its just u get excited [¶ ] I just get excited and cant stop haha but it wont haplen again till you are ready ready for sure."

## II.    Defense Case

Loya testified that he and H.G. became friends their freshman year in high school. They thought about dating, but she said her brother would not be okay with her having a boyfriend so they remained friends. After graduation, they lost touch until June 2018, when Loya saw H.G. at the drive-through where she worked.

They began texting a lot and made plans to meet another friend at the local college. H.G. rode with Loya to the college. When they arrived, they began making out in his car. H.G. told Loya to put his seat back and she climbed over the center console to get on top of him. She allowed him to touch her under her clothing and put his fingers in her vagina. That was the first time he had any physical contact with her.

They met a second time at the park, where they made out. The third time they met, again at the park, H.G. had mentioned she was hungry and Loya bought food for her. They hung out and kissed in Loya's car. H.G. climbed on top of him in the car and he penetrated her vagina within his fingers. They were talking about entering into a relationship during this period of time.

The fourth time, Loya and H.G. met at the park. H.G. was thirsty and they went to a snack shop, where H.G. met Loya's mother. They returned to the park and sat there talking. H.G. commented she needed to get ready for work and Loya needed to get a bottle for his daughter. H.G. said she still had some time and went with him. She had never been to his house and let him know this was another step in their relationship, so he thought maybe she wanted to take things a step further.

At the house, Loya gave his daughter a bottle and put her down with the television on. He was sitting on the edge of the bed in his bedroom and H.G. stood in front of him. They began making out. He picked her up, she wrapped her legs around him, and he carried her to the bed in the living room.

They laid down and continued kissing. H.G. "started to get more into the situation," biting his neck and scratching his back. Together, they pulled her leggings off, and he penetrated her vagina with his fingers. She grabbed his arms and moaned, "giving off a vibe where she was getting really into it." He testified that at no point did she tell him no or stop. He took out his penis and they tried to have sex.

H.G. told him to give her a minute. They continued to kiss and then tried again. He penetrated her vagina with his penis, and they had sex for several minutes. She told him she was in pain and needed a few minutes. He withdrew and they continued to kiss. They agreed to try a different position and she positioned herself over the bed. They tried to have sex for several more minutes, but she told him it hurt too much. They agreed to stop and try another time due to the pain, and they continued kissing for another 15 to 20 minutes. He testified that her demeanor was the same throughout, and at no time did she cry or tell him she did not want to have sex.

Loya then gave H.G. a ride back to her car so she could get ready for work. She was friendly and laughed during the ride. When she got out, she giggled and said, " 'Dang, I can't even walk.' " She did not say anything to him about not wanting to have sex.

He texted her shortly thereafter, asking " 'You home?' " Then, " 'How are you feeling?' " He testified he asked how she was doing because of her comment when she got out of his car. She responded, " 'Not okay,' " and he asked, " 'Why? What's wrong[?]' " Loya testified that later on, she let him know she was not okay with what happened, but prior to then, he did not know she felt that way and he thought she consented. He was upset by her later response because he thought they agreed at the time.

Regarding his texted response that although she said no, he thought she wanted to deep down, and he messed up and should not have pressured her, he explained that H.G. had told him she wanted her first time to be special. He thought that was what she was referring to, and he felt bad when he later learned she felt pressured.

He again explained he knew she had wanted her first time to be special but based on her body language, he thought she was ready. He later found out she was not okay with what happened. He felt bad and apologized because he knew he had messed up their relationship. He testified that if she had told him at his house that she did not want to have sex, he would have stopped.

On cross-examination, Loya acknowledged he knew H.G. was a virgin and that she told him a number of times she was not ready to have sex, including about 12 hours before they went to his house. However, he said she previously told him that if she was ever ready, she would make it seem like she wanted to have sex with him; and if she was not ready, he did not think she would have gone to his house or moved forward with their relationship. An hour or two later, he learned that she had not wanted to have sex.

The prosecutor questioned Loya regarding the following excerpts from the pretextual phone call:

"[H.G.]: …'I told you to get off. You didn't do it. I kept telling you.'

9.

"[Loya]: ...'I didn't mean to. I'm sorry. I shouldn't have done it. I told you that I feel like shit and I've been thinking about it. I feel like shit. It wasn't okay. I shouldn't have done it, I know.' [¶] ... [¶]

"[H.G.]: ...'Okay. But dude, when I tried – I tried getting off, foo, and I tried getting my pants even when I kept telling you no and you still did it.'

"[Loya]: ...'Okay, Stop. I feel real bad, dude. I didn't want to do it. I didn't mean to make you feel like that.' [¶] ... [¶] 'I felt so fucking bad. I felt so upset because you told - - I literally remember you telling me I want to wait, and I said of course, I'm not going to force anything on you. And when I did, it fucking sucks.' "

Loya acknowledged his statements but reiterated that he thought H.G. was ready, based on her body language. On redirect, he testified that he did not do anything to H.G. physically that she did not want to, so he thought at the time. She told him to stop only twice, when she wanted to take a break due to the pain and that was the reason they changed positions.

## DISCUSSION

### I.    Section 654 Claim

Neither the trial court nor the parties addressed the applicability of section 654 during sentencing, and the court imposed concurrent terms for rape and false imprisonment.[3]  Loya claims this was error and argues his sentence for false imprisonment should have been stayed under section 654 because the two crimes were part of an indivisible course of conduct with a single criminal objective.  As explained below, we conclude that the two crimes were committed pursuant to a single criminal objective, with the false imprisonment facilitating the rape.  Therefore, we agree with

---

[3]    The parties agree that the issue was not forfeited. "Errors in the applicability of section 654 are corrected on appeal regardless of whether the point was raised by objection in the trial court or assigned as error on appeal." (*People v. Perez* (1979) 23 Cal.3d 545, 549, fn. 3; accord, *People v. Hester* (2000) 22 Cal.4th 290, 295.)

10.

Loya that the trial court erred when it failed to stay his sentence on count 2 under former section 654.

As amended by Assembly Bill No. 518, the trial court now has discretion to select which term to stay under section 654. As set forth in part II. of the Discussion, remand for resentencing on count 1 is required under Senate Bill No. 567. Accordingly, following resentencing on count 1, the trial court shall stay the sentence on one of the two counts under section 654. (*People v. Sek* (2022) 74 Cal.App.5th 657, 673-674 [Assem. Bill No. 518 applies retroactively to nonfinal cases]; accord, *People v. Mendoza* (2022) 74 Cal.App.5th 843, 861-862 & fn. 14 [same]; *People v. Mani* (2022) 74 Cal.App.5th 343, 379-380 [same].)

### A.  Legal Standard

Section 654, as amended by Assembly Bill No. 518, provides, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (§ 654, subd. (a).) The statute "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).) "Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry." (*People v. Corpening* (2016) 2 Cal.5th 307, 311 (*Corpening*).) "We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives." (*Ibid.*)

11.

We review the trial court's express or implied factual findings for substantial evidence, and its conclusions of law de novo. (*People v. Brents* (2012) 53 Cal.4th 599, 618; *People v. Perez*, *supra*, 23 Cal.3d at p. 552, fn. 5; *People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603.) We "affirm the trial court's ruling, if it is supported by substantial evidence, on any valid ground." (*People v. Capistrano* (2014) 59 Cal.4th 830, 886, fn. 14 (*Capistrano*), overruled in part on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 103-104; accord, *People v. Brents*, *supra*, at p. 618.) If, as in this case, there is no "explicit ruling by the trial court at sentencing, we infer that the court made the finding appropriate to the sentence it imposed, i.e., either applying section 654 or not applying it." (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1045, citing *People v. Tarris* (2009) 180 Cal.App.4th 612, 626-627).

## B.     Analysis

### 1.     Multiple Intents and Objectives Inquiry

"Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses." (*Corpening*, *supra*, 2 Cal.5th at p. 313.) The relevant inquiry is whether " 'a separate and distinct act can be established as the basis of each conviction.' " (*People v. Beamon* (1973) 8 Cal.3d 625, 637 (*Beamon*); accord, *Corpening*, *supra*, at p. 316.) The actus reus of rape is sexual intercourse (§ 261, subd. (a)), while the actus reus of false imprisonment is restraint (§ 236; *People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1360). The parties do not argue that this case involves a single physical act and, therefore, we turn to whether the crimes were " 'a course of conduct deemed to be indivisible in time.' " (*Harrison*, *supra*, 48 Cal.3d at p. 335, quoting *Beamon*, *supra*, at p. 639; accord, *Corpening*, *supra*, at p. 311.)

Generally, " ' "[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent

12.

and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." ' " (*Capistrano*, *supra*, 59 Cal.4th at p. 885, quoting *People v. Rodriguez* (2009) 47 Cal.4th 501, 507.) However, " '[b]ecause of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an "act or omission," there can be no universal construction which directs the proper application of section 654 in every instance.' " (*People v. Hicks* (2017) 17 Cal.App.5th 496, 514, quoting *Beamon*, *supra*, 8 Cal.3d at p. 636; accord, *Harrison*, *supra*, 48 Cal.3d at p. 336.) Section 654 "is intended to ensure that [the] defendant is punished 'commensurate with his culpability' " (*Harrison*, *supra*, 48 Cal.3d at p. 335), and "a 'broad and amorphous' view of the single 'intent' or 'objective' needed to trigger the statute would impermissibly 'reward the defendant who has the greater criminal ambition with a lesser punishment' " (*id.* at pp. 335-336, quoting *People v. Perez*, *supra*, 23 Cal.3d at p. 552).

" 'If [the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Porter* (1987) 194 Cal.App.3d 34, 38, quoting *Beamon*, *supra*, 8 Cal.3d at p. 639; accord, *Harrison*, *supra*, 48 Cal.3d at p. 335; *People v. Tom* (2018) 22 Cal.App.5th 250, 260.) "Whether the defendant maintained multiple criminal objectives is determined from all the circumstances and is primarily a question of fact for the trial court, whose finding will be upheld on appeal if there is any substantial evidence to support it." (*People v. Porter*, *supra*, at p. 38, citing *People v. Goodall* (1982) 131 Cal.App.3d 129, 148; accord, *People v. Tom*, *supra*, at p. 260.) " 'The temporal proximity of the two offenses is insufficient by itself to establish that they were incident to a single objective' " (*People v. Jackson* (2016) 1 Cal.5th 269, 354, quoting *Capistrano*, *supra*, 59 Cal.4th at p. 887; accord, *Harrison*, *supra*, at p. 335), but, relevant here, "if all of the

13.

crimes were merely incidental to or were the means of accomplishing or facilitating a single objective, the defendant may receive only one punishment" (*People v. Islas* (2012) 210 Cal.App.4th 116, 129, citing *People v. Latimer* (1993) 5 Cal.4th 1203, 1208; accord, *People v. Hicks*, *supra*, 17 Cal.App.5th at p. 514).

## 2. Rape Facilitated by False Imprisonment

The People dispute the claim that Loya's sentence was unauthorized under section 654. Relying on *People v. Lopez* (2011) 198 Cal.App.4th 698 (*Lopez*) and *People v. Felix* (2001) 92 Cal.App.4th 905, 915 (*Felix*), they contend that the two crimes were divisible in time. They also posit that it is reasonable to infer Loya had the separate intent of silencing H.G. when he restrained her facedown on the bed. On the facts of this case, we are unpersuaded.

*Lopez* and *Felix* are readily distinguishable. In *Lopez*, the defendant stole the victim's purse at one location and then used her credit card at a different location. (*Lopez*, *supra*, 198 Cal.App.4th at p. 717.) In addition to committing the crimes at different times and locations, the Court of Appeal found it was reasonable to conclude that the defendant's objective changed during that time from stealing the purse for its contents to obtaining merchandise with the credit card. (*Id.* at pp. 717-718.) Similarly, in *Felix*, this court found that separate punishment was permissible where the defendant made two separate threats on the same day, but at different times and locations, and directed toward an additional victim on the second occasion. (*Felix*, *supra*, 92 Cal.App.4th at pp. 908-909, 915-916.)

Here, Loya was convicted of rape by force or fear, and the record reflects, both in evidence and argument, use of force. The force used to commit the rape was the same force employed to falsely imprison H.G. on the bed. Specifically, Loya pinned H.G. to the bed with his body weight and grasp on her hands, which facilitated the rape. (Compare *People v. Hensley* (2014) 59 Cal.4th 788, 828 [§ 654 applied where shooting underlying attempted murder count facilitated robbery] & *People v. Latimer*, *supra*, 5

14.

Cal.4th at pp. 1216-1217 [§ 654 applied where no evidence of intent or objective underlying kidnapping other than to facilitate rape] with *People v. Saffle* (1992) 4 Cal.App.4th 434, 439-440 [false imprisonment was divisible from sex offenses where, after completing the sex offenses, the defendant imprisoned the victim with the intent of dissuading her from reporting the crime].) Moreover, we reject the People's contention that it is reasonable to infer Loya flipped H.G. over and pinned her on the bed with the separate objective of silencing her. There is no factual support for this theory. (*People v. Kelly* (2018) 28 Cal.App.5th 886, 903 ["On appeal, '[a] trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld ... if supported by substantial evidence' [citation], that is, evidence which is reasonable, credible, and of solid value.' "].) Instead, the record reflects that Loya repositioned and pinned H.G. to the bed, facedown with his hand on her head, incidental to the penetration of her vagina.[4]

On these facts, the trial court's implied finding that the rape and the false imprisonment involved separate intents and objectives is not supported by substantial evidence. (*Capistrano*, *supra*, 59 Cal.4th at p. 886; *People v. Mesa* (2012) 54 Cal.4th 191, 199.) On remand, following resentencing on count 1 under Senate Bill No. 567, the trial court shall apply section 654, as amended by Assembly Bill No. 518, to one of the counts.

## II. Senate Bill No. 567

When Loya committed the crimes in this case in 2018, he was 20 years old, and the trial court sentenced him to the middle term on count 1. Effective January 1, 2022, Senate Bill No. 567 amended section 1170. In relevant part, section 1170 provides that "unless the court finds that the aggravating circumstances outweigh the mitigating

---

[4]    The prosecutor elected to charge one count of rape and one count of false imprisonment. Thus, this case does not present the question of whether these facts could support separate punishments for two counts of rape.

circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense." (§ 1170, subd. (b)(6)(B).) Additionally, subdivision (d)(9) of section 1170 provides, "Paragraph (8) does not prohibit the court from resentencing the defendant to a term that is less than the initial sentence even if none of the circumstances listed in paragraph (8) are present."

The parties agree that Senate Bill No. 567 applies retroactively to cases not yet final on appeal under *In re Estrada* (1965) 63 Cal.2d 740. (*People v. Banner* (2022) 77 Cal.App.5th 226, 240; *People v. Garcia* (2022) 76 Cal.App.5th 887, 902; *People v. Flores* (2022) 75 Cal.App.5th 495, 520; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.) They disagree whether remand is required, however. The People acknowledge Loya is a youth within the meaning of the statute but argue that the trial court already considered his age when it selected the middle term; and, based on the sentencing record, the court "implicitly found that imposition of the lower term sentence would be contrary to the interests of justice."

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' " and where the defendant has been sentenced in the absence of informed discretion, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; accord, *People v. Flores* (2020) 9 Cal.5th 371, 431-432.)

The trial court expressly considered imposing either the lower term or the middle term. It stated Loya's age and lack of any criminal record favored the lower term but concluded Loya's lack of truthfulness when testifying, lack of remorse, and minimization

of the crime supported imposition of the middle term. Following the enactment of Senate Bill No. 567, the lower term is now the *presumptive* term given Loya's age. We express no view on how the trial court should exercise its discretion on remand, but Loya is entitled to a sentencing choice informed by this ameliorative change in the law (§ 1170, subd. (b)(6)), and the record does not " ' "clearly indicate" ' " (*People v. Gutierrez, supra*, 58 Cal.4th at p. 1391), either expressly or impliedly, that "remand would be an idle act" (*People v. Flores, supra*, 9 Cal.5th at p. 432, citing *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425). Therefore, we shall remand the matter for resentencing under section 1170, as amended by Senate Bill No. 567.

## DISPOSITION

Loya's sentence is vacated, and this matter is remanded for resentencing under section 1170, subdivision (b)(6), as amended by Senate Bill No. 567, and section 654, as amended by Assembly Bill No. 518. The judgment is otherwise affirmed.

SMITH, J.

WE CONCUR:

HILL, P. J.

POOCHIGIAN, J.

17.